# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **PUBLIC SERVICE COMPANY OF COLORADO,** | Case No. CV 91-035-S-EJL |
| **Plaintiff,** | (Lead Case) |
| **vs.** | |
| **DIRK KEMPTHORNE, in his official capacity as Governor of the State of Idaho,** | **MEMORANDUM ORDER** |
| **Defendant.** | |
| **UNITED STATES OF AMERICA,** | Case No. CV 91-054-S-EJL |
| **Plaintiff,** | |
| **vs.** | |
| **DIRK KEMPTHORNE, in his official capacity as Governor of the State of Idaho; STATE OF IDAHO,** | |
| **Defendants.** | |

On March 31, 2003 this Court entered an order denying Plaintiff's motion to dismiss/motion for summary judgment and granting Defendants' motion for summary judgment and declaratory ruling. (Dkt. No. 266). The Ninth Circuit reversed and remanded the matter. (Dkt. Nos. 276, 278). A status conference was held whereupon both parties withdrew their motions and stipulated to a period of discovery. (Dkt. Nos. 287, 288, 289, 290). The parties also agreed that the matter would be decided by way of a court trial which was held on February 6, 2006. (Dkt. No. 336). At the conclusion of the trial, the Court directed the parties to submit briefing which the parties have now done and the matter is ripe for the Court's consideration. (Dkt. Nos. 345, 346, 347). Accordingly, the Court enters the following order.

**Factual and Procedural Background**

This case has a lengthy factual and procedural history which centers around the transportation, receipt, storage, management, and removal of hazardous wastes at the Idaho National Engineering Laboratory ("INEL").[1]  The INEL was established in 1949 to research various types of nuclear reactors.  The INEL has since broadened its research to include other engineering facilities and research, including the Radioactive Waste Management Complex ("RWMC") where the Department of Energy ("DOE") manages waste generated by national defense sources and research programs.

The original complaint in this matter was filed on February 7, 1991.  The parties in the action at that time were Plaintiff Public Service Company of Colorado, Defendant then Governor of the State of Idaho, Cecil D. Andrus, and Counter Defendant the DOE.  (Dkt. No. 1, Case No. CV91-35-S-EJL).[2]  A similar action was also filed by the United States of America against Governor Andrus and the State of Idaho (hereafter the "State" or "Idaho").  (Dkt. No. 1, Case No. CV91-54-S-EJL).  In that action (Case No. CV91-54-S-EJL), the State of Idaho filed counterclaims against the United States of America.  The cases were consolidated with Case No. CV91-35-S-EJL being made the lead case.  The issues presented involved the review of the DOE's decision to store spent nuclear fuel at the INEL.

On May 7, 1991, the Honorable Harold L. Ryan granted the United States' motion for summary judgment and Public Service Company of Colorado's motion for preliminary injunction

---

[1]  The name of the facility has been changed several times since it was opened.  When it opened in 1949 it was called the National Reactor Testing Station ("NTRS").  It then became the Idaho National Engineering Laboratory (INEL) and in 1997 was changed to the Idaho National Engineering and Environmental Laboratory (INEEL).  Today, the facility is called the Idaho National Laboratory ("INL").  This order shall hereafter refer to the facility as INEL.

[2]  Cecil D. Andrus was the Governor of the State of Idaho in the initial action filed in 1991.  Governor Philip Batt was substituted when the matter was re-opened in 1995.  At present, Dirk Kempthorne is serving as Governor of the State of Idaho and has been substituted as the named Defendant accordingly.  (Dkt. No. 224).

which enjoined Governor Andrus and the State of Idaho from interfering with the transportation of spent nuclear fuel across the highways of Idaho for storage at INEL. The parties filed cross motions for summary judgment. On June 28, 1993, Judge Ryan entered an order granting the State of Idaho's motion for summary judgment and denied the United States' motion for summary judgment. (Dkt. No. 118). The Court also enjoined the DOE from any further transportation, receipt, processing, and storage of spent nuclear fuel at INEL until a comprehensive Environmental Impact Statement ("EIS") was completed as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* The EIS was to examine alternatives concerning transportation, receipt, storage and management of spent nuclear fuel at the INEL. (Dkt. No. 118). The Court retained jurisdiction over the case to resolve any disputes between the parties regarding the final EIS.

Following the issuance of the EIS, this matter was re-opened on May 19, 1995 to address the State's concerns regarding the United States' compliance with the final EIS. (Dkt. No. 149). The parties again filed countering motions for summary judgment. On October 17, 1995, during then Governor Philip Batt's administration, the parties resolved the matter by entering into a settlement agreement ("1995 Agreement"). (Dkt. No. 219). The Court entered an order adopting the 1995 Agreement and again retained jurisdiction over the case. (Dkt. No. 220).

The matter is again before the Court on the State's motion to re-open the case pursuant to the Court's retained jurisdiction seeking to contest the United States' compliance with the 1995 Agreement. (Dkt. No. 223). Specifically, the State seeks a determination that the DOE is obligated, pursuant to the express terms and conditions of the 1995 Agreement, to remove all transuranic waste located at the INEL no later than 2018, including, but not limited to transuranic waste which was indiscriminately buried in the subsurface disposal area. (Dkt. No. 223).[3] The Court granted

---

[3] Certain waste was deposited at both the Subsurface Disposal Area ("SDA"), as buried waste, and at the Transuranic Storage Area ("TSA"), in an above ground storage area.

the motion and ordered that the case be reopened.  (Dkt. No. 231).[4]  The parties then filed their cross

motions.[5]  The Court found in favor of the State and the decision was appealed.  (Dkt. No. 266).

The Ninth Circuit reversed and remanded the decision with the following direction:

> We remand the case for the district court to consider the parties' extrinsic evidence,
> including the source of the 65,000 cubic meter estimate, in interpreting the contract
> so as to give effect to the second clause as well as the first.  See Gumport v. AT&
> T Techs., Inc., (In re Transcon Lines), 89 F.3d 559, 568 (9th Cir. 1996) (stating that
> the parol evidence rule "does not prohibit the use of evidence to clarify or to explain
> ambiguous terms" of a contract).

(Dkt. No. 276, p. 3).  Accordingly, the Court held a four and a half day bench trial where both

parties presented evidence regarding the interpretation of the 1995 Agreement and, in particular,

the 65,000 cubic meters estimate.  Having presided over this matter for several years, and having

heard the evidence, reviewed the record, and considered the parties' oral and written arguments, the

Court finds as follows.

## Analysis

This is a contract case.  As with everything in the law, but even more so in contract law,

words are our tools.[6]  The words expressed in a contract become legally binding and enforceable

commitments upon the parties once the contract is finalized.  Where the words are clear there is

little dispute over the commitments upon each party.  Where, however, words are unclear the

---

[4] Plaintiff, Public Service Company of Colorado, has been dismissed with prejudice pursuant to the parties stipulation.  (Dkt. Nos. 261 and 263).

[5] The Plaintiff in the current action is the United States of America ("United States"); in particular the DOE and Navy.  The Defendants are the Honorable Dirk Kempthorne, in his official capacity as Governor of the State of Idaho, and the State of Idaho.

[6] "The law is a literary profession: words are our tools.  Hence, writing is of paramount significance.  We lawyers are different form medical doctors, accountants, and most professionals.  A surgeon may, in silence, perform a laminectomy or indeed a hemilaminectomy.  The surgeon and accountant need to know how to do their work.  We, too, need to know how to do our work but we need to communicate effectively using written words.  There is a Latin maxim that he who knows but cannot express what he knows might as well be ignorant (*Qui novit neque id quod sentit exprimit perinde est ac si nesciret*).  This applies more to lawyers than to others."  Law Society Gazette, January/February 1998, p. 8.

MEMORANDUM ORDER
06ORDERS\INEEL_TRIAL

contract must be interpreted to give meaning to the parties' intent. The meaning of a contract term can only be ascertained when viewed in the context in which the parties drafted the terms. "Any determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, [and where applicable] usages of trade, and the course of dealing between the parties." See Restatement (Second) of Contracts § 202, 219-23 (1981). After the transaction has been shown in all its length and breadth, the words of an integrated agreement remain the most important evidence of intention. See Restatement (Second) of Contracts § 202 (1981).

1)    <u>Posture of the Parties</u>:

The Court's inquiry begins by viewing the context of the contract negotiation and the posture of the parties when the negotiations of the 1995 Agreement began. On May 17, 1995 the State moved to reopen the case. (Dkt. No. 148). The Court reopened the case and reimposed the June 28, 1993 injunction which stopped any further shipments of spent nuclear fuel into Idaho. (Dkt. No. 149). Former Governors Andrus and Batt both testified that at the time they felt the United States was not keeping its commitments to Idaho and both were concerned that Idaho would become a *de facto* dumping ground, or permanent repository, unless an agreement was reached

assuring that the waste stored at INEL would be removed from Idaho.[7] (Batt, pp. 82-84, 87).[8] The State also feared for the safety of the Snake River aquifer located directly below the waste buried at the subsurface disposal area ("SDA"); this fear stemmed from the recent leak of radioactive material at the Hanford facility that was threatening the Columbia River coupled with the knowledge that the wastes buried prior to the 1970's were stored in containers with a life-expectancy of twenty or twenty-five years which, in 1995, were nearing expiration. In some cases, the waste was contained only in cardboard boxes. (Andrus, pp. 19, 21, 23-24; Batt, pp. 72, 74-75; Lance, pp. 152-55). This fear was bolstered by Idaho's own experience with carbon tetrachloride from the National Reactor Testing Station ("NTRS")[9] which had migrated 600 vertical feet toward the Snake River aquifer. (Andrus, pp. 20, 30).

The State expressed its concerns and fears regarding the buried waste at INEL in a telegram to Dixie Lee Ray at the Atomic Energy Commission ("AEC").[10] (Andrus, pp. 20-21). The telegram was an effort by the State to obtain assurances from AEC that the waste at INEL, in particular the buried waste, would be removed from INEL. Thus, from the State's perspective the removal of waste centered around the buried waste at the INEL. The safety and security of the underground

---

[7]

 Governor Batt had enumerated three goals or principles regarding waste at INEL stating that: 1) Idaho will oppose the shipment of nuclear waste material to our state until we receive an absolute assurance that the material will ultimately be moved outside of our state; 2) Idaho will insist on a proper cleanup of existing storage problems, including the cleanup of material that was indiscriminately buried years ago, and 3) Idaho will seek attractive projects that will create new employment opportunities at the INEL. These three goals became the basis of the State's position throughout the 1995 negotiations. (Grumbly, pp. 37-40). The goals were reported in an opinion piece carried in the local paper, a letter, and other sources. (Defendant's Exs. 516, 518).

[8]

 Because neither party has ordered a final corrected copy of the transcript, the citations to the transcript in this decision are made to the rough copy of the transcript from the February, 2006 court trial. The transcript citations herein provide the name of the testifying witness and the corresponding page number, however, the page numbers may differ from those in a final corrected copy of the transcript ordered at a later time.

[9] As footnoted previously, NTRS was the original name for INEL.

[10] The AEC was the previous title for the agency which later became the DOE.

aquifer was a "lightning rod" issue in this case and was of primary importance to Idaho. (Guida, p. 101). Any leak of the wastes into the Snake River aquifer would not only have tremendous political ramifications, but also an economic impact of gigantic proportions throughout the State since the Snake River traverses nearly the entire length and width of the State of Idaho. (Lance, pp. 152-55).

The United States brought to the table the pressing need to remove and store spent nuclear fuel rods from Navy ships, which had been halted when Idaho secured the injunction upon reopening the case. (Guida, p. 93; Frei, pp. 167-169; Grumly, pp. 6, 8-11, 18-22). The delay in shipments of spent fuel rods to Idaho was creating a national security issue in that at least some nuclear powered ships could not operate until this settlement was resolved. (Batt, pp. 76-77; Grumbly, pp. 6, 8-11, 18-22; Frei, p. 168). Additionally, the DOE had its own spent fuel objective to bring foreign based spent fuel to the United States for storage because the fuel was coming out of reactors in unstable countries around the world and could potentially be made directly into nuclear weapons.[11] (Grumly, p. 22). Politically in 1995, the DOE was under budget constraints from Congress relief from which the DOE was seeking the support of Idaho's congressional delegation. (Grumly, p. 18-19). Finally, witnesses for the United States testified that DOE desired to reverse the perception that it had not lived up to its past obligations. (Grumbly, p. 9). According to Mr. Grumbly, the federal government wanted to improve its credibility by fulfilling its obligations and commitments which had not occurred in the past. (Grumbly, p. 9). For all of these reasons the Navy and DOE wanted very much to settle the dispute with Idaho.[12]

---

[11]

The DOE was trying to implement a policy of bringing back research reactor fuel stored in other countries to protect the world from proliferation of plutonium and weapons grade material; the policy began under President Eisenhower entitled The Atoms For Peace Program. (Mr. Frei, p. 168; Trever, p. 31).

[12]

Mr. Frei also testified that while the DOE wanted to settle this matter with the State quickly and in a timely fashion, he stated "I would not say we were under a tremendous amount of pressure. I would not paint a picture of people running

With that background, the bargaining positions of the parties becomes clear.  Idaho held an important bargaining chip having obtained an injunction precluding the shipment of the Navy's spent nuclear waste which was causing a national security problem thereby enabling the State to proclaim the August 31, 1995 proposal as its final offer.  The United States' own objectives meant that it too was eager to reach a settlement in this matter.

2)      Interpretation of the 1995 Agreement:

The express language of the 1995 Agreement requires DOE to remove all transuranic waste, as defined in the Agreement, out of Idaho regardless of where it is located at the INEL.  Paragraph B.1 states:

> B.      TRANSURANIC WASTE SHIPMENTS LEAVING IDAHO
>
> 1.      DOE shall ship all transuranic waste now located at INEL, currently estimated at 65,000 cubic meters in volume, to the Waste Isolation Pilot Plant (WIPP) or other such facility designated by DOE, by a target date of December 31, 2015, and in no event later than December 31, 2018.

Transuranic waste is expressly defined in the contract at Paragraph A.4 of the 1995 Agreement and states that "'Transuranic waste' shall be defined as set forth in the EIS, Volume 2, Appendix E," which states:

> **transuranic waste**   Waste containing more that 100 nanocuries of alpha-emitting transuranic isotopes with half-lives greater than 20 years per gram of waste, except for (a) high-level radioactive waste; (b) waste that the U.S. Department of Energy has determined, with the concurrence of the Administrator of the U.S. Environmental Protection Agency, does not need the degree of isolation required by 40 CFR 191; or (c) waste that the U.S. Nuclear Regulatory Commission has approved for disposal on a case-by-case basis in accordance with 10 CFR 61.

---

around the building screaming what do we do, what do we do.  No, we were looking at this document, looking at the time frame in which we had to respond and deciding which issues we were going to bring back to the table hopefully to resolve with the state."  (Frei, p. 169).  Although this testimony provides a context for the DOE's posture at the time of the negotiations, having viewed all of the testimony in the case the Court concludes that the United States was under pressure and motivated to settle the case, as was the State of Idaho.

The words of the contract could not be clearer.  The waste meeting this definition and located at INEL must be removed from Idaho as stated in Paragraph B.1.  It is the definition, not the 65,000 cubic meter estimate, that controls the obligation to remove waste under the 1995 Agreement.  For better or worse, both parties are bound by the definition both as to what it includes and what it does not.

a)    Drafting History - Alpha Low-Level Waste and Transuranic Waste Definition:

This definition was a contested point in the negotiations.  In arriving at the definition of transuranic waste, the State sought repeatedly to include alpha low-level waste in the definition.  (Trever, pp. 22, 53-82).  Idaho was particularly concerned about alpha low-level waste being removed because of future projects proposed by DOE at INEL which had the potential for alpha low-level waste to be stored at INEL permanently.  (Trever, pp. 22, 55-82, 166-68).  This is consistent with Idaho's efforts throughout these negotiations to expand the waste subject to removal from INEL.  (Frei, p. 155; Urie, pp. 182-83; Trever, pp. 9-12, 53-82).  On the other hand, the United States was insistent that transuranic waste be defined as in the EIS which excluded alpha low-level waste.  Late in the negotiations, the State ceded the point and alpha low-level waste was taken out of the final definition thereby removing any obligation upon the United States to remove alpha low-level waste from INEL.[13]  (Grumbly, pp. 47-49; Trever, pp. 81).

---

[13] Idaho's intent to remove all waste was consistent even though it ultimately agreed to remove alpha low-level waste from the agreement because the State believed alpha low-level waste could be addressed through the Resource Conservation and Recovery Act which is subject to the State's authority.  (Trever, p. 81).

MEMORANDUM ORDER
06ORDERS\INEEL_TRIAL

United States' witnesses testified that alpha low-level waste was removed from the definition so that the definition was consistent with other applicable Federal documents and regulations and because WIPP would not accept alpha low-level waste. (Frei, p. 155-57; Guida, pp. 68-69, 76-78). The Federal Government acknowledges that although not included in the definition of transuranic waste, the intent was to remove the alpha low-level waste by mixing it with transuranic waste stored at the Transuranic Storage Area ("TSA") to meet the requirements for shipment to WIPP. The United States maintains this intent is evidence by the DOE documents used by Ms. Trever and the parties' negotiations for the Site Treatment Plan. These intentions, however, were not conveyed to Idaho's negotiators. (Batt, pp. 100, 103; Trever, pp. 166-67).

The United States points out that the EIS, used to define transuranic waste, estimates the amount of waste stored at TSA was 65,000 cubic meters. The United States concludes that because Idaho knew the intent was for alpha low-level waste and transuranic waste at TSA to be treated together for removal to WIPP, Ms. Trever's conclusions regarding the 65,000 cubic meter estimate are unreasonable. Because the two waste streams were to be managed together, the United States contends, the quantity of material for removal referenced by the 65,000 cubic meters could only be that waste stored at the TSA. In response, Ms. Trever noted that figure used a definition which included both transuranic and alpha low-level waste. (Trever, 120-122, 143). During cross-examination of Ms. Trever, counsel noted portions of the ROD (Ex. 69) which stated that transuranic and alpha low-level wastes were generally expected to be managed together and that the site treatment facility was for treatment of alpha low-level waste such that it meets the acceptance criteria for disposal at WIPP. (Trever, pp. 128-29). In response, Ms. Trever acknowledged the ROD did speak to those things but that the statements were "at odds" with other portions of the ROD. Id. On redirect, Ms. Trever clarified that the ROD's application of the management of alpha low-level and transuranic wastes together seemed to only apply to storing and

characterizing the waste not treatment and disposal because the ROD discussion regarding treatment did not coincide with the later plan proposals which included disposal of alpha low-level waste at the INEL.  (Trever, pp. 166-68).  In short, the State viewed the ROD's inclusions of potential program options where alpha low-level waste remained at the INEL as DOE's attempt to keep these options on the table thereby causing concern to the State about the potential of such wastes being permanently stored at the INEL; directly contrary to the State's goals of removal.

The United States also points to the negotiations between the State and DOE regarding the site treatment plan at the INEL required by the Federal Facilities Agreement and Consent Order ("FFA/CO").  (Trever, pp. 129-133).  These negotiations were ongoing at the time of the drafting of the 1995 Agreement.  Drafts of the site treatment plan called for the construction of a facility called the advanced mixed waste treatment plant which would manage transuranic waste and mixed alpha low-level waste together as they traditionally had been and that most mixed transuranic waste would be shipped to WIPP.  (Trever, p. 132).  During testimony, Ms. Trever challenged the terms "most" mixed waste would be shipped to WIPP and that the waste was "managed" together. (Trever, p. 132).  Mr. Rasch, who was in charge of the site treatment plan (Ex. 128), testified that the State was aware of the plan to treat the waste and ship it to WIPP.  (Rasch, p. 45, 50, 52-53). Mr. Rasch, however, was not part of the negotiations of the 1995 Agreement.  The final site treatment plan was executed two weeks after the 1995 Agreement on November 1, 1995. (Ex. 128). Thus, while drafts of the site treatment plan may have discussed the possibility that alpha low-level waste and transuranic waste would be managed together and possibly shipped to WIPP, these draft proposals did not address the State's concerns to achieve definite deadlines for removal of alpha low-level waste.  Just the opposite, the drafts likely caused greater concern to the State as they evidenced the possibility that alpha low-level waste might remain at the INEL.

In sum, the United States' efforts to show that Idaho was aware of the United States' intention behind removing alpha low-level waste from the definition was to make the definition consistent with its other documents and that the parties still intended for alpha low-level waste to be treated with transuranic waste for shipment to WIPP is to no avail.  Their own witness, Mr. Frei was unable to point to any provision in the language of the 1995 Agreement reflecting the intention or understanding that the 1995 Agreement was intended to require removal of both transuranic waste and alpha low-level waste exclusively from TSA.  (Frei, pp. 158-59).  Quite simply, the words expressed in the contracts do not convey this intent.  Had the parties discussed and/or arrived at an understanding regarding the treatment of alpha low-level waste during their negotiations, such an understanding is not included in the 1995 Agreement and the language contained in the final contract controls the obligations which are binding upon the parties.  The United States must now live with the definition for transuranic waste which they feverishly negotiated for and agreed to in the contract.  In short, transuranic waste as defined in the 1995 Agreement must be removed from INEL regardless of where it is located at the INEL.  Just as the United States is bound by the language of the contract, so too is the State of Idaho who must accept the fact that regardless of any understanding spoken of between the parties, the 1995 Agreement does not require the United States to remove alpha low-level waste.

b)      Significance of the 65,000 cubic meters estimate in Paragraph B.1:

DOE further asserts the 65,000 cubic meter estimate itself evidences that the parties intended for waste to be removed only from the Transuranic Storage Area ("TSA") not the Subsurface Disposal Area ("SDA").  On appeal, the Ninth Circuit determined that there was an ambiguity in the agreement concerning what the 65,000 cubic meter estimate referred to in Paragraph B.1 and provided that this Court could use extrinsic evidence to resolve the same.  (Dkt. No. 276).   The Ninth Circuit's only disagreement with this Court's prior ruling was its

determination that this Court had not considered the second sentence of Paragraph B.1 relating to the 65,000 cubic meters estimate; stating that if the estimate was not reasonable then the Court had to resolve that ambiguity.  Nothing else was suggested or ruled on as error, so arguably the State is correct in suggesting that is the only issue before this Court.  Having now viewed the record, testimony, and evidence presented the Court finds that the evidence clearly shows that the 65,000 cubic meters of waste was a reasonable estimate of the amount of transuranic waste located at the INEL as it is defined in the 1995 Agreement.  The evidence also establishes that the 65,000 cubic meter figure was a reasonable estimate initially of the transuranic and alpha low-level waste stored above ground and, more importantly, was confirmed by the State to be a reasonable estimate of all the transuranic waste located above and below ground when alpha low-level waste was removed by the United States from the definition for transuranic waste.  Because it was never thought to be an exact figure, the 65,000 cubic meter estimate was not an issue of contention at the time of the negotiations.  (Trever, p. 142).

When Idaho conceded to the removal of alpha low-level waste from the contract definition of transuranic waste, Ms. Trever undertook an investigation to determine whether any other language modifications were necessary after the definition change and to assure that the 1995 Agreement satisfied the stated purpose from Idaho's perspective:  to remove the waste from endangering the Snake River aquifer.  (Trever, pp. 81-83).  In doing so, Ms. Trever realized the 65,000 cubic meter estimate had remained the same throughout the draft changes and that she needed to verify the number.[14]  (Trever, pp. 82-83).  Ms. Trever's investigation caused her to look

---

[14]
The 65,000 cubic meter number appeared first in the State's draft of July 26, 1995.  (Ex. 586).  This draft provided that "the total volume of transuranic waste shipped out of Idaho shall be no less than 65,000 cubic meters."  (Ex. 586, 3.A(3)).  The definition of transuranic waste in this draft included alpha low-level waste.  (Ex. 586, 2.D).  Subsequent to this draft proposal, the parties met in Chicago and Minneapolis and exchanged numerous drafts and phone calls.  Ultimately, the State sent its August 31, 1995 final offer which included the commitment to ship all transuranic waste out of Idaho by a specified date with a definition of transuranic waste that included alpha low-level waste.  Ms. Trever testified

to the DOE Programmatic Spent Nuclear Fuel Management and Idaho National Engineering Laboratory Environmental Restoration and Waste Management Programs Final EIS, April 1995 (Ex. 588) ("1995 EIS"), the May 30, 1995 ROD for the 1995 EIS (Ex. 69), the Engineering Design File for INEL 1995 EIS (Ex. 554), and the August 1995 Draft Waste Management Programmatic EIS (Ex. No. 585) ("Waste Management EIS"), as well as other documents. Ultimately, Ms. Trever concluded that the 65,000 cubic meters estimate was a reasonable estimate for transuranic waste at the INEL in the TSA, the SDA, and other areas as it was defined in the 1995 Agreement to exclude alpha low-level waste. (Trever, p. 86, 90, 114). Generally, Ms. Trever determined that based on the different figures provided in the DOE documents the estimated range for all transuranic waste at the INEL was between 60,000 and 70,000 cubic meters. (Trever, p. 87). Given that it was the United States' definition of transuranic waste being used and such definition was consistent with their documents, Ms. Trever did not discuss her conclusion regarding the estimate with the United States. (Trever, pp. 87, 143) (stating "because they had been using the right number in conjunction with the definition of transuranic waste that they were using.").

It was entirely reasonable for Ms. Trever to have undertaken the investigation in the manner she did in light of the fact that during the negotiations when the State inquired as to the definition the United States' response was to refer the State to the EIS without further explanation. (Guida, p. 105). Given this direction, Ms. Trever did exactly what the United States told her to do; she looked to DOE documents, including the two EISs, to ascertain the meaning of 65,000 cubic meters estimate contained in Paragraph B.1. At this point in the negotiations had the United States wanted to clarify its intent that removal was limited to that waste stored at the TSA it could easily have

that "[o]nly later did I realize that the volume used in [Paragraph B.1] was not consistent with our definition of transuranic and alpha low-level waste, but that ended up being resolved later." (TR, pp. 36, 38). The volume number was included as "a reasonable estimate of all of the transuranic waste and alpha low-level waste as we defined it." (Trever, p. 38). The United States submitted a draft in response (Ex. 526) which removed alpha low-level waste from the definition of transuranic waste but left the volume estimate the same.

done so by stating as much when asked about the definition by the State.  Instead, United States simply referred State officials to other documents. Ms. Trever's reasoning from these other materials is sound.  By utilizing DOE's other documents the State seemingly had met the United States' stated purpose behind the change in the definition of transuranic waste:  make the definitions and the contract consistent with its other Federal documents.  Having heard the testimony at trial, the Court finds Ms. Trever's investigation to have been appropriate and reasonable; arriving at a sound understanding of the 65,000 cubic meters estimate of transuranic waste as defined by DOE in the 1995 Agreement.

The United States' argument here is that both parties intended the agreement to mean something other than what it says; that the 65,000 cubic meter figure defines the volume and location of the waste subject to removal.  This subjective intent of the meaning of 65,000 cubic meters estimate on the part of the United States, however, was not communicated to Idaho officials. (Batt, pp. 102-03; Lance, p. 158; Frei, p. 127; Grumbly, pp. 50-51; Sullivan, pp. 196-201; Nordhaus, pp. 34-40).[15]  It is clear from the evidence that among themselves, United States' officials commonly understood the "65,000 cubic meters" to refer to only the waste stored at the TSA.  (Guida, pp. 105-07, 116-18, Frei, pp. 130-31; Urie, pp. 178-80; Grumbly, pp. 32-33; Nordhaus, pp. 37-38).  It is equally clear that this was not the understanding of the State of Idaho who had consistently maintained that all waste at the INEL, and in particular the buried waste, must be removed.  (Batt, pp. 102-03; Lance, p. 158).

---

[15]  Mr. Urie, however, testified that "at some point or points during the negotiations and specifically during a conference call or calls, that representatives from the Department of Energy and representatives from the State of Idaho discussed the fact that 65,000 cubic meters of transuranic waste is meant 65,000 cubic meters of waste located in the retrievable stored area." (Urie, p. 185).  Though he remembers this occurring, Mr. Urie had no specific recollection of when or with whom such a conversation took place.  Mr. Urie was a staff attorney in the general counsel's office under Mr. Nordhaus and provided legal advice and support to those who were preparing the EIS and stated he was involved in the negotiations of the 1995 Agreement as a participant in the telephone conference calls between the parties.

The 65,000 cubic meters estimate in Paragraph B.1 is neither a floor nor a ceiling but an estimate. (Trever, p. 38). The language in the contract is that the 65,000 cubic meters was a "reasonable estimate" which corroborates the State's argument that the language of the estimate was never intended to be a quota or limit on the waste to be removed. Nor has the United States provided evidence that the parties' intent was that DOE would only remove 65,000 cubic meters of waste. The estimate does not limit or define the waste subject to removal as the United States argues. Instead, the definition of transuranic waste contained in Paragraph A.4 controls the meaning "transuranic waste" in Paragraph B.1 that must be removed.

The federal government argues that Ms. Trever's status in these negotiations was minimal and that the Court should not put great weight in her testimony. The evidence shows, however, that the State of Idaho relied heavily on her input in these complex negotiations. Both Governor Batt and then Attorney General Lance testified that they were direction and policy makers in these negotiations and that the contract details were left up to the staff, in particular Ms. Trever. (Batt, pp. 106, 109, 111-12, 146- 47; Lance, pp. 157-60, 164). It is only reasonable then to find that an attorney with a matter of this importance would make a careful review of the wording and detail involved in the contract. Ms. Trever's investigation into the 65,000 cubic meter estimate was a necessary result of the fact that she was relied upon to confirm the details of the contract and the State's overarching concern regarding the buried waste over the aquifer.

The language of the contract itself yields credibility to Ms. Trever's testimony and conclusion because it uses the word "all" in terms of removal of transuranic waste located at INEL. Idaho did not believe the 65,000 cubic meters was a quota or fixed amount but, instead, just what the words say it is, a "reasonable estimate." The United States argues that the terms "all" transuranic waste and "now located at INEL" create only a technical ambiguity, when in fact these terms go to the very heart of the negotiations given the posture of the parties at the time of the

MEMORANDUM ORDER
06ORDERS\INEEL_TRIAL

negotiations.  Ms. Trever's investigation into the 65,000 cubic meters estimate was undertaken to assure that Idaho's concerns regarding the removal of waste would be satisfied; i.e. that "all" meant "all."  (Trever, p.38, 82-87).  It was in Idaho's own interests to assure that the 65,000 cubic meters figure was a reasonable estimate.  Since Idaho wanted "all" transuranic waste removed it only stands to reason that Idaho would want to know that the number was a "reasonable estimate" of the volume of transuranic waste located at INEL.  Having viewed Ms. Trever's testimony first-hand, the Court finds her to be a knowledgeable and credible witness concerning the negotiations of the 1995 Agreement.

c)      <u>Consistency Between the Contracts and Within the 1995 Agreement</u>:

The United States next argues that to require removal of buried waste would result in an inconsistency between Paragraph G.1, Paragraph E, and the Federal Facilities Agreement and Consent Order ("FFA/CO").  (Green, p. 24).  Such an inconsistency, the United States asserts, supports its position that the parties intended for buried waste to be considered separate from the 1995 Agreement.  In particular, the United States argues that Paragraph G.1 expressly leaves the buried waste to be addressed by the terms of the FFA/CO and Paragraphs E.1 and E.2 spell out that the treatment facility built at the INEL was to mix the transuranic waste with the alpha low-level waste for shipment to WIPP; this, the United States asserts, is what the parties intended under the 1995 Agreement.  Idaho, on the other hand, points out that neither Paragraph G.1 or E nor the FFA/CO address removal of waste but, instead, involve the treatment and remediation of waste.  Therefore, the State maintains there is no inconsistency  between the contracts nor within the 1995 Agreement's own terms.  Removal, the State argues, is covered by the 1995 Agreement and remediation is covered by the FFA/CO.

A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.  Restatement (Second) of Contracts § 202(2) (1981).  To the extent possible

all provisions in a contract are to be construed together in an effort to give legal effect to all of its provisions if at all possible.  See Klamath Water Users, 204 F.3d 1206, 1210 (9th Cir. 1999) (citing Kennewick Irrigation Dist. v. United States, 880 F.2d 1018, 1032 (9th Cir. 1989) ("A written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations."); see also Central Arizona Water Conservation Dist. v. United States, 32 F.Supp.2d 1117, 1127 (D. Ariz. 1998) ("A contract must be construed in its entirety, rather than from reading one provision in isolation from the rest of the contract.").  The same is true when the parties enter into two or more contracts concerning the same subject matter.

"The normal rule of construction, of course, is that courts must interpret contracts, if possible, so as to avoid internal conflict."  Westlands Water Dist., 134 F.Supp.2d at1135; see also Central Arizona Water Conservation Dist. v. United States, 32 F.Supp.2d at 1128 ("A court should construe a contract in a manner that gives full meaning and effect to all its provisions and avoid an interpretation which leaves part of the contract meaningless or unreasonable") (citing Kennewick). "Preference must be given to reasonable interpretations as opposed to those that are unreasonable, or that would make the contract illusory."  Kennewick Irrigation Dist. v. United States, 880 F.2d 1018, 1032 (9th Cir. 1989) (citation omitted).  As such, the Court's interpretation here arrives at a resolution avoiding any internal conflict and providing a reasonable interpretation of the contracts giving both sides the benefits of the bargain for which they argued and satisfying the goals of both parties as conveyed at the time of the negotiations.

The FFA/CO is a process for investigating and deciding how to remediate the various waste at INEL and includes enforceable deadlines upon which the parties must proceed.  (Green, p. 11). Paragraph G.1 of the 1995 Agreement states:

> G.    INEL ENVIRONMENTAL RESTORATION PROGRAM
>
> 1.    INEL  Environmental  Restoration  Program  to Continue.

> DOE shall continue to implement the INEL environmental
> restoration program in coordination with Idaho and EPA.
> Such implementation shall be consistent with the schedules
> contained in the Federal Facilities Agreement and Consent
> Order (FFA/CO) entered into with the State of Idaho, EPA
> and DOE, and it shall include schedule requirements
> developed pursuant to the completed and future Records of
> Decision under the FFA/CO.  The sole remedies for failure
> to implement the environmental restoration activities
> specified in the FFA/CO shall be those specified in the
> FFA/CO.

As to their obligations on the parties, the FFA/CO and the 1995 Agreement do not conflict. Instead they address two different matters in terms of the waste at INEL.  The FFA/CO concerns the process for determining how to remediate the buried waste at INEL, thereby incorporating CERCLA law.  The 1995 Agreement relates to the obligation to remove waste from INEL.  This distinction was recognized by many of the United States' own witnesses.  Mr. Frei stated that the 1995 Agreement "is not about how we are going to do things, it is a commitment of what we are going to do in terms of dealing with the waste on site."  (Frei, p. 157).  Mr. Frei acknowledged that neither Paragraphs G.1 or E requires disposal or removal of waste but only discuss treatment or the building of a treatment facility.  (Frei, pp. 158-59).  Mr. Rasch also conceded that the site treatment plan, as required by the FFA/CO, did not require shipment anywhere outside of Idaho but only treatment of waste.  (Rasch, pp. 52-53, 63-65).  Ms. Trever testified that in her discussion with Ms. Sullivan regarding the enforcement provisions of the contracts that she pointed out the distinction between the FFA/CO's environmental restoration activities and the 1995 Agreement's obligation to remove waste.  (Trever, pp. 46-49).[16]  As a result of their discussion, the words "as modified" were deleted from Paragraph G.1 so as to recognize that the two agreements addressed different obligations.  The obligation to remove transuranic waste being distinct and separate from the

---

[16]  Governor Batt also testified that no one from the United States ever conveyed that the FFA/CO was to exclusively cover the buried waste at INEL.  (Batt, p. 103)

environmental restoration activities specified in the FFA/CO. (Trever, p. 52).  Thus, the United

States is required to remove that waste specified in the 1995 Agreement.  The United States is also

required to continue the remediation process outlined in the FFA/CO.  Paragraph G.1 assures that

the two agreements, the FFA/CO and the 1995 Agreement, remain consistent by requiring that the

parties continue to implement the INEL's environmental restoration program with the EPA upon

the schedules contained in the FFA/CO.

Considering the parties' positions at the time of the negotiations, it is clear that all of the

parties intended for the FFA/CO restoration programs to continue and that Paragraph G.1 of the

1995 Agreement would incorporate the provisions of the FFA/CO.[17]  Two things are important

about Paragraph G. First, it specifically addresses the scheduling of when and how things are to be

done consistent with CERCLA law.  Ms. Green testified that if the 1995 Agreement required

removal of transuranic waste from the SDA it would conflict with the requirements of the FFA/CO

and CERCLA because removal of waste would need to occur before a remedy had been decided

under CERCLA.  (Green, p. 25).  Recognizing this potential scheduling conflict, the Court has read

these provisions to arrive at a consistent interpretation.  In fact, the Court finds it is not difficult at

all to reconcile Paragraph G.1 with Paragraph B.1.  The FFA/CO controls the implementation of

the environmental restoration program.  Removal of buried transuranic waste, as required by the

1995 Agreement, must be done in compliance with the environmental restoration time line set forth

in the FFA/CO.  Stated another way, to the extent that the 1995 Agreement puts a different schedule

---

[17]  It is also clear that the DOE did not want to expand the remedies provided for by the FFA/CO.  In fact, the
United States was "adamant" about not expanding the enforcement provisions that had already been provided for under
the FFA/CO. (Trever, pp. 44, 46).  Ms. Sullivan testified that "anything covered by another cleanup agreement would not
be covered by this agreement" and "that we were not giving the State of Idaho in this agreement additional remedies with
respect to waste streams that were already covered by another agreement." (Sullivan, p. 197-200).  This is consistent with
the interpretation stated here.  The FFA/CO and 1995 Agreement operate in cooperation with one another but cover distinct
obligations.  The FFA/CO applies to the remediation process that is to be employed.  The 1995 Agreement applies to the
obligation to remove certain waste from INEL.

on when buried transuranic waste is to be removed and it cannot be reconciled with the earlier agreement, the FFA/CO, prevails as to the time frame applicable for conducting the remediation process for the buried waste - the obligation to remove, however, remains.  As the United States has argued, CERCLA law governs remediation and cleanup of hazardous waste and the CERCLA process will necessarily drive the time-line upon which remediation here can proceed.  This only makes sense given that neither party would have agreed to subject people to an unwarranted risk by requiring removal without employing the CERCLA process to determine whether removal is safe.  The removal of transuranic waste located at the TSA must continue upon the time frame contained in the 1995 Agreement as it does not present the same need for CERCLA compliance as the buried waste.  Second, the EPA was not a party to the 1995 agreement and any conflicts over which it had jurisdiction are not before the Court at this time.

This interpretation of the distinct obligations of the FFA/CO and 1995 Agreement is realized when reading the documents in their entirety.  Paragraph G.1 of the contract assures that the FFA/CO's environmental restoration activities for the treatment of buried waste remain and become part and parcel of the 1995 Agreement.  However, it is clear that the FFA/CO does not address when or how transuranic waste is to be located or stored once it is treated.  The parties to the 1995 Agreement clearly had authority to resolve that open question.  While parties cannot contract to do something that is contrary to the law or to refrain from doing something the law requires, parties are free to negotiate and obligate themselves to do something over and above what the law or some prior agreement obligated or required them to do.  The FFA/CO does not address what should happen to the buried transuranic waste once it is remediated and treated pursuant to CERCLA's rules and regulations.  Unless something is encountered that would prohibit its removal, the 1995 Agreement obligates the United States to remove all transuranic wastes, with the buried transuranic waste being  on a time schedule dictated by CERCLA and the FFA/CO.  The fact that it may be

cheaper or that under CERCLA it is determined that the waste could be stored safely in Idaho does not negate the United State's obligation to remove the waste from Idaho under the 1995 Agreement. Accordingly, the Court will retain jurisdiction over this matter to monitor this obligation but the State must understand its agreement to allow CERCLA law to function as set forth in Paragraph G.1 of the 1995 Agreement. Should the EPA ultimately conclude that removal of certain waste is too dangerous and the State disagrees, the Court would necessarily have to resolve that dispute and the Court retains jurisdiction to do so.

The United States also argues that to require removal of buried transuranic waste under the 1995 Agreement would cause conflict with Paragraph E. Paragraphs E.1 and E.2 relate to the building of a treatment facility at INEL and state:

E.    TREATMENT & TRANSFER OF EXISTING WASTES AT INEL

1.    Treatment Commitment. DOE agrees to treat spent fuel, high-level waste, and transuranic wastes in Idaho requiring treatment so as to permit ultimate disposal outside the State of Idaho.

2.    Mixed Waste Treatment Facility. DOE shall, as soon as practicable, commence the procurement of a treatment facility ("Facility") at INEL for the treatment of mixed waste, transuranic waste and alpha-emitting mixed low-level waste ("Treatable Waste"). DOE shall execute a procurement contract for the Facility by June 1, 1997, complete construction of the Facility by December 31, 2002, and commence operation of the Facility by March 31, 2003. Commencement of construction is contingent upon Idaho approving necessary permits.

As Mr. Frei testified, Paragraph E says nothing about the plan to blend alpha low-level waste for disposal outside of Idaho. (Frei, pp. 158-59). In fact Paragraph E does not require treatment or removal of any waste, let alone alpha low-level waste, from Idaho. Instead, it requires the treatment of spent fuel, high-level waste, and transuranic wastes "so as to permit ultimate disposal outside the State of Idaho" (Paragraph E.1) and the building of the mixed waste treatment facility (Paragraph E.2). The treatment commitment of Paragraph E.1 speaks only to "spent fuel,

high-level waste, and transuranic wastes...."  The treatment facility required by Paragraph E.2 does indicate that it will be able to treat "alpha-emitting mixed low-level waste ('treatable wastes')" but does not require such treatment nor removal of any such waste already existing at INEL.  Paragraph E.2(a) speaks to the treatment of "treatable wastes" shipped into Idaho for treatment at the new facility and any transuranic wastes received from another site shall be treated and shipped outside Idaho within six months.  Therefore, interpreting Paragraph B.1 to require removal of buried transuranic waste does not conflict with the precepts of Paragraph E.  As noted previously, this language does not convey any intention that alpha low-level waste would be treated with transuranic waste for shipment to WIPP thereby limiting the waste at issue in the 1995 Agreement to that waste stored at the TSA.

3)      Particular Arguments:

        a)      Subjective Intent:

        The United States invites the Court to accept its subjective intent that the 1995 Agreement limited removal of waste to only that waste stored at the TSA and that although alpha low-level waste at TSA is not included in the definition of transuranic waste or expressly required to be removed it would be mixed and removed, as being the understanding and intent of the parties.  The Court respectfully declines to do so.  While the Federal government now seems to argue that if the State had said something about this it "would of, could of, or should of" clarified the language but argue that regardless this Court should accept its subjective intent as the proper interpretation of the contract language.  "[T]he relevant intention of a party is that manifested by him rather than any different undisclosed intention. In cases of misunderstanding, there may be a contract in accordance with the meaning of one party if the other knows or has reason to know of the misunderstanding and the first party does not."  Restatement (Second) of Contracts §§ 200, 201 (1981).  "When a party

is thus held to a meaning of which he had reason to know, it is sometimes said that the 'objective' meaning of his language or other conduct prevails over his 'subjective' meaning.  Even so, the operative meaning is found in the transaction and its context rather than in the law or in the usages of people other than the parties."  Restatement (Second) of Contracts § 212 cmt. a (1981).  Simply put, if one party has an intent in mind, but such intent is never articulated to the other party during negotiations and the language of the contract is not changed during negotiations to reflect the subjective intent, the final language of the contract should not be interpreted according to the party's undisclosed subjective intent.

When lawyers, after weeks negotiation, settle on words with a common and accepted meaning such as "all" transuranic waste as defined specifically in the contract and "located at INEL" they should be held responsible for what they agreed to.  Parties are held accountable not only for what they say but for what they do not say if there was a duty to speak.  It seems only reasonable that if the Federal government intended the agreement to be restricted to the transuranic waste above-ground it would have said so.  The words "all transuranic waste now located at INEL" are all inclusive terms and unambiguous, particularly when viewing the evidence of the parties intent.

The United States' failure to make its intentions known is evidenced by the fact that at least two negotiators for the United States testified that they recognized a problem with the language in the contract, but after bringing it to the attention of their primary negotiators, elected not to make an issue of it in favor of reaching a final settlement.  That language of the contract is critical to the Court's determination.  The negotiators for the United States knew the language of Paragraph B.1 was vague and possibly a problem and informed their supervisors of this concern.  The concern, however, was not conveyed to Idaho.  There is some indication that the language was not clarified

with the State because the United States' negotiators knew it was a potential "deal breaker" with Idaho.  (Frei, pp. 165-172).

Mr. Guida testified that the State's August 31, 1995 draft contained a significant change to Paragraph B.1 which did not include the word "stored" at INEL but, instead, referred to all transuranic waste located at INEL. (Guida, p. 115)  This change, Mr. Guida testified, caused him to question the DOE regarding what the change meant and its implications and to clarify with the DOE that what the State was referring to was still the same material the United States believed to be the subject of Paragraph B.1.  (Guida, p. 116).  Mr. Guida spoke with either or both of Mr. Urie and Mr. Frie who assured Mr. Guida that in their opinion the material was the same and that if clarification was needed they would do so.  (Guida, p. 117).  Mr. Guida also acknowledged that he never spoke to the State about the language nor was present when anyone from the United States spoke to the State.  (Guida, p. 118).

Mr. Frei also testified that the State's August 31, 1995 draft contained a change in the language of Paragraph B.1.  (Frei, p. 166).  Mr. Frei stated that he was "concerned" about the language change and whether people outside the parties' negotiating the agreement would know what was meant by the paragraph.  (Frei, pp. 166-67).  Mr. Frei also raised the issue with DOE officials, Mr. Grumbly in particular.  The Federal government officials responded that this was the State's final offer and given the pressures to reach an agreement and not wanting to see the State walk away from the negotiating table, United States' negotiators made a "judgment call" concerning which items to bring back to the table for comment and which items they did not raise for discussion.  The judgement was made by senior management to not raise this particular language issue with the State.  (Frei, pp. 165 - 172).  Frei's testimony is qualified.  He did not state that he was afraid Idaho would walk away from the table, but that the United States wanted to raise those

issues that they felt were crucial so that a resolution could be reached quickly.  (Frei, pp. 168-169).

His concern was as to a misconception to those outside of the negotiations.  (Frei, p. 174).  In

particular, the transcript reads as follows:

| | |
|---|---|
| Mr. Early: | Mr. Frei, you just testified that it was your understanding after the August 31 draft and continuing on into the final draft, that the agreement related to the 65,000 cubic meters. But at the time you received the August 31 draft and looked at it, you saw that if this agreement was read by somebody outside of the DOE that did not have your understanding, that wouldn't be clear, correct? |
| Mr. Frei: | It was my concern that there might be some uncertainty by parties outside of the negotiating parties not understanding what that section meant. |
| Mr. Early: | And you made a judgment call not to raise that with the State of Idaho, correct? |
| Mr. Frei: | Given the conditions the Governor was putting on the Department, the Department elected not to raise that issue in its response back to the August 31 proposal. |
| Mr. Early: | And, indeed, did not raise it, correct? |
| Mr. Frei: | We did not raise it. |

(Frei, pp. 173-74).

The Court finds the fact that the United States noticed that the contract language contained

some uncertainty as to the United States' intent and their affirmative decision to not clarify their

intentions is telling.  Both Mr. Guida and Mr. Frei's testimony reveal that the United States'

negotiators knew there was a vagueness or, at least, a possibility for misunderstanding.  While Mr.

Frei qualified his concern to those "outside of the negotiating parties," it begs the question of why,

given the importance of the agreement and obvious publicity, the language was not made clear.[18]

---

[18] Mr. Frei's testimony that DOE officials elected to not raise their concern regarding the language with Idaho is qualified by his statement that his concern was that there would be "uncertainty by parties outside of the negotiations."  (Frei, p. 174).  This testimony makes clear that DOE believed that everyone, including Idaho, understood the 65,000 cubic meters to refer to waste stored at TSA and to include alpha-low-level waste but it does not evidence that the State was ever

If the United States had a different understanding of the language and realized that the language was unclear, their decision to not raise the issue leaves the United States stuck with the final contract language. Had they wanted to clarify their interpretation the opportunity was present. This issue arose for the United States late in the negotiations and a settlement was needed. (Frei, pp. 165-72).[19] The testimony of both of these witnesses further evidences the fact that the United States' subjective intentions as to the material covered by the agreement was not conveyed and, in this instance, deliberately not clarified with the State. It is somewhat disingenuous for the United States to have known of the language problem but not clarify it at the time of the negotiations and now argue after the fact that their subjective intent should be considered by the Court. The United States cannot now claim that it meant to say something different than what the language of the 1995 Agreement states.

b)   Course of Performance:

DOE offered evidence of its course of performance under the 1995 Agreement which it argues supports its interpretation of the contract. Because it has performed under the contract consistent with its understanding of the 1995 Agreement and the State has not objected, the United States contends that its interpretation should control. In particular, DOE points to its completion of the Site Waste Treatment Facility, its compliance with shipments of waste from the TSA out of Idaho, and that it has met most of the other contract deadlines. Mr. Frei testified that the DOE's conduct following the 1995 Agreement has been consistent with its interpretation of the contract in that it implemented construction of the treatment facility as required by Paragraph E. (Frei, pp.

---

informed of this understanding nor is there evidence in the record which establish this fact.

[19] Governor Batt testified that the August offer was final because "it was time to bring the matter to some closure and the public was still demanding and expecting some action out of me, rightly so. So I submitted this offer, along with the public statement that it was the final offer." (Batt, p. 97).

158-59).  Mr. Rasch also testified regarding the site treatment plan and modifications made to the schedule to align the FFA/CO and the 1995 Agreement time frames.  (Rasch, pp. 53-56).  The site treatment plan was required by the FFA/CO for management, treatment, and development of treatment technologies for the treatment of waste.  (Rasch, pp. 46).

Evidence of course of performance is relevant to contractual interpretation.  <u>See</u> Restatement (Second) § 202(4) (1981) ("Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.").  Though DOE may be correct that they have acted in accordance with their understanding of the terms of the 1995 Agreement, no evidence has been provided to the Court that establishes the State has acquiesced to the performance or waived its right to challenge DOE's performance under the contract.

Regardless of DOE's conduct, the court finds the plain language of the 1995 Agreement does not support the DOE's interpretation.  Moreover, there is no indication that the State acquiesced to change the terms of the 1995 Agreement once DOE began performance.  This lawsuit itself is evidence of the State's objection.  In addition, the State voiced its disagreement when Ms. Trever met with Ms. Green.  (Green, pp. 27-28).  DOE's performance cannot be used to bind the State of Idaho to contract terms not expressed in the agreement nor can performance overcome the express language of the contract.  <u>See</u> Restatement (Second) of Contracts § 203 (1981) ("express terms are given greater weight than course of performance...").

c)     <u>Post Contract Statements</u>:

The United States offered evidence of statements made immediately following the finalization of the 1995 Agreement which it argues proves that Idaho's understanding was

consistent with United States' interpretation.  In particular the United States points to Governor Batt's statements as reported in various newspapers following his appearance at a public forum, other published speeches, and statements in his book.  Other evidence presented by the United States are a fact sheet issued by the State to answer public questions regarding the 1995 Agreement and other similar public releases by the State and statements made at legislative hearings by officials for both parties.  (Ex. 33).  United States also presented evidence that the public response to the 1995 Agreement was unfavorable and, in fact, resulted in efforts to remove Governor Batt from office and a ballot initiative to invalidate the 1995 Agreement.  The United States argues the State's failure to correct statements which were inconsistent with the State's interpretation of the 1995 Agreement evidence that the State knew of and agreed with United States' interpretation.  The Court finds this evidence to be inconclusive and unpersuasive.

The newspaper articles are four separate accounts of Governor Batt's appearance in Burley, Idaho in December of 1995, a month and a half after the 1995 Agreement was finalized.[20]  (Exs. 85-88).  The articles were all published on December 7, 1995 and are nearly identical with respect to the portions emphasized by the United States regarding statements Governor Batt allegedly made in response to challenges by Dr. Peter Rickards at the Burley forum.  The articles either quote or report that Governor Batt had stated that buried waste was not part of the negotiations of the 1995 Agreement but was instead covered by another agreement.  (Batt, pp. 119-129).  Generally newspaper articles and the statements made therein are considered hearsay and precluded by Federal Rule of Evidence 801(d) as are quoted statements reported in newspaper articles.  See Larez v. City of Los Angeles, 946 F.2d 630, 642 (9th Cir. 1991).  An exception to this rule exists where the "extraordinary circumstances" surrounding the proffered articles provide sufficient guarantees

---

[20]  Two of the articles were written by named reporters (Exs. 86, 87) and the other two articles were associated press articles (Exs. 85, 88).

of trustworthiness such that they can be admitted under the residual hearsay exception.  Id. at 643. In Larez the Ninth Circuit found that such extraordinary circumstances were present where the statements were reported by three independent newspapers and the statements were attributed the declarant who did not dispute making the statements; determining that upon these facts the reports were trustworthy thereby satisfying the first two sub-sections of then Rule 803(24).[21]  Id.  The Ninth Circuit did, however, determine the admissibility of the reports was in error as they were not the best evidence of the statements; noting the reporters' testimonies subject to cross-examination would have been the best evidence.  Id. at 644.  Here, although the exhibits were admitted because they contained some guarantee of trustworthiness, the Court does not find them to be persuasive evidence of the intent of the parties at the time of these negotiations.

The Court admitted the articles not for the truth of the statements but, as the United States argued, as one piece of evidence in the Federal Government's case which they asserted would be tied in with subsequent testimony bearing on the issues presented here.  (Vol. I, 126-29).[22]  These articles were not "linked up" with other testimony or evidence that the State knew and did not intend for the 1995 Agreement to cover buried waste.  Moreover, the reliability of the articles was drawn into question.  During testimony, Governor Batt stated that he did not recall exactly what was said at the Burley appearance and that he could have been misquoted and that the portions of the articles the United States was pointing to were "speculation" and/or the reporters' own accounts of the Burley event.  (Vol. I, p. 121).  In addition, the articles alone are not the best evidence of the statements made at the Burley appearance.  See Larez, 946 F.2d at 644.

---

[21]  Federal Rule of Evidence 803(24) has since become Rule 807.

[22]  Vol. I relates to the rough transcript of record from the first day of trial.

The United States puts considerable weight on the challenges and statements made by Dr. Rickards to Governor Batt regarding buried waste at the Burley appearance. The evidence shows that Dr. Rickards and Governor Batt did not see eye to eye on many political matters, particularly matters related to nuclear waste. In fact, Dr. Rickards was vocally opposed to the 1995 Agreement and had initiated the recall drive against Governor Batt as well as being a candidate for the Republican nomination for an Idaho congressional seat at the time of these reports. Governor Batt testified that he was not eager to engage in an exchange with Dr. Rickards. (Batt, p. 119-21, 141). Dr. Rickards was also not called as a witness or subject to cross-examination during the trial and his statements made to Governor Batt as reported in the newspaper articles are hearsay without any indicia of trustworthiness. Accordingly, Dr. Rickards' statements in the articles are not given any weight as evidence of the State's intentions regarding the 1995 Agreement.

As to Governor Batt's statements in speeches, his book, and the like the Court likewise does not find that they provide significant evidence of the State's interpretation of the 1995 Agreement. (Exs. 38, 58, 106, 107, and141). In his book, the United States points to a top ten list of accomplishments of the 1995 Agreement with number ten referring to a previous agreement which addressed the buried waste. (Ex. 58). Likewise, Governor Batt also made one statement during this trial that the FFA/CO, as he understood it, required DOE to remove buried waste at INEL. (Batt, p. 115). The FFA/CO does not require such removal. This single response during his testimony and the bullet point in his book, however, are less persuasive than the bulk of Governor Batt's testimony which reflects that while he possessed a general understanding of the contract obligations at issue here, he had clearly and unequivocally conveyed that Idaho's position was that buried waste must be removed from INEL. Governor Batt stated that he was the policymaker and left the details of the contract to his staff to finalize but demanded that the agreement satisfy the three goals he had set forth. (Batt, pp. 106, 109, 111-12, 146-46). This is evident from the record. Many of his public

statements in 1995 and even his testimony here used general laymen's terms to describe the contracts at issue and the obligations therein but the stated goals of the State remained clear and consistent.      The Court finds the evidence of Governor Batt's three goals, which he made clear to his own staff and to the United States, are more telling of the State's intentions than any of the other more generalized statements he may have made after the 1995 Agreement was finalized. Moreover, these isolated statements made following the negotiations do not accurately reflect the big picture of what the State's intentions were as reflected by the totality of the evidence presented. Governor Batt testified he was the policy maker, not the drafter of the details of the 1995 Agreement.  While it is true Governor Batt signed the 1995 Agreement on behalf of the State, nothing in the record establishes he was aware of the United State's subjective intent regarding what was to be removed from the INEL.  Public statements by Governor Batt weeks after the 1995 Agreement was signed are not determinative of the parties' intent at the time the 1995 Agreement was executed.

Finally, the United States points to the State's refusal or failure to respond to public opinion and comments which were contrary to the State's interpretation.  Without a doubt, there was strong public opinion expounded following the finalization of the 1995 Agreement much of which was in opposition  to the terms of the agreement.  This public reaction was understandable given the complexity of the interrelationship between the two agreements regarding buried waste and, as a result, the public's general misunderstanding regarding the buried waste and the requirement that it be removed.  The public response highlights the level of importance this issue held to the citizens of Idaho and the State's officials during the negotiations.  The fact that, as the United States argues, if the State had a different intention from that reported in the media it would have made that intention known is an argument dispelled by the State during testimony.  At trial, the State officials testified that they made a conscious decision to not respond to many of the reports for various

reasons.  (Batt, pp. 142-43, Trever, p. 149).  Governor Batt testified that his office generally did not respond to the criticisms in the media "because to do so would only give public forum to the accuser" and the articles offered by the United States were "the type of thing [his office] did not respond to."[23]  (Batt, p. 143).  Likewise, the State official's testimony at the legislative hearings is consistent with Idaho's position here and the fact that DOE officials testified differently without objection by the State officials is attributable to the nature of legislative hearings.  (Trever, pp. 152-57).  These reports and statements were made subsequent to the parties signing and finalizing the 1995 Agreement.  What was said between the parties during the negotiations is more reflective of the parties intentions.

4)      <u>Conclusion</u>:

        Ultimately the interpretation of this contract has been a search for the common meaning of the parties at the time they entered into the 1995 Agreement.  It is hard to imagine that the parties to the 1995 Agreement intended anything other than what was put in writing.  The final draft was the result of intense negotiations with multiple drafts going back and forth between the parties.  The Court's interpretation of the parties' obligations under the 1995 Agreement assures that the concerns of both parties will be met.[24]  The United States has been and will be able to store spent nuclear fuel at INEL and the ultimate removal of buried waste from INEL will continue to progress on the timetable established in the FFA/CO and in accordance with the requirements of CERCLA.  The State of Idaho is assured that waste will be removed and such waste will no longer endanger

---

[23] Ms. Trever testified that the State was aware of the articles but "a decision was made that trying to clarify these and other reporting errors relating to the agreement would give opponents of the agreement another day with reporters, the decision was made not to take any action in terms of issuing a written statement or demand for retraction."  (Trever, p. 149).

[24] "The objective of interpretation in the general law of contracts is to carry out the understanding of the parties rather than to impose obligations on them contrary to their understanding...."  Restatement (Second) of Contracts § 201 cmt. c (1981).

MEMORANDUM ORDER
06ORDERS\INEEL_TRIAL

the Snake River aquifer.  The waste located at the TSA will be removed upon the time schedule outlined in the 1995 Agreement and the buried waste shall be removed, once it is determined if and how it can safely be moved, as directed by the FFA/CO and CERCLA.  This decision also resolves the question posed by the Ninth Circuit.  The ambiguity identified by the Ninth Circuit was not an ambiguity in the wording itself, but only whether the 65,000 cubic meters figure was a reasonable estimate of transuranic waste.  Ms. Trever's testimony establishes that the Federal government's own documents support that the amount of transuranic waste, as defined in the 1995 Agreement, above and below ground was approximately 65,000 cubic meters.

## ORDER

Based on the foregoing and being fully advised in the premises the Court **HEREBY ORDERS** as follows:

1)  Defendants' Motion for Declaratory Judgment (Dkt. No. 223) is **GRANTED**.

2)  Jurisdiction is retained by this Court as stated herein.

3)  Defendants' Motion in Limine (Dkt. No. 324) was **DENIED** at trial.

DATED:  **May 25, 2006**

Honorable Edward J. Lodge
U. S. District Judge

MEMORANDUM ORDER
06ORDERS\INEEL_TRIAL